IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FILED
SCRANTON

FEB 27 2014

PER _____
DEPUTY CLERK

JOHN WAYNE CESSNA,

      Plaintiff,

         v.

Pennsylvania Department of Corrections to include
the following personell located within the
specified Institutions.

ROBIN M. LEWIS, Chief Hearing Examiner located at
SCI-Camp Hill; Located at SCI-Waymart, WAYNE J.
GAVIN, Superintendent; RONDA ELLETT, DSFM; PAUL M.
DELROSSO, DSCS; LAURA BANTA, CCPM; EDWARD KOSCIUK,
Major; MICHAEL MURPHY, Unit Manager; LORI WHITE,
Unit Manager; JOSEPH VINANSKI, Superintendent's
Assistant; ANNE PLAKSA, Hearing Examiner; DUANE
DOBBS, Captain; MICHAEL DELUCY, Lt.; RAYMOND
STENDER, Lt.; JODY SMITH, Lt.; RODNEY QUINN, Sgt.;
DAVID EVANS, Sgt.; MARK BERKOSKI, CO1; LUCIANO
DRIVER, CO1; TIM SHIFFER, CO1; KEVIN WERTMAN, CO1;
CHAD SHUMAN, CO1; DAVID SPRY, CO1; KARL KELLER,
CO1; BRYAN MARTIN, CO1; sued in their individual
and official capacities,

      Defendants.

14-361

Civil Action No.

_____

HON.

CIVIL ACTION

JURY TRIAL DEMANDED

## COMPLAINT

### I. INTRODUCTION

This is a civil rights action filed by John Wayne Cessna, a state prisoner,
for damages, injunctive relief, and declaratory judgment authorized by 42
USC §1983 to redress the deprivation, under color of state law, of rights

secured by the Constitution of the United States.

## II. JURISDICTION AND VENUE

1. Jursidiction of this Court is invoked pursuant to 28 USC §1331 in that this is a civil action arising under the Constitution of the United States.

2. Jurisdiction of this Court is invoked pursuant to 28 USC §1343 (a)(3) in that this action seeks to redress the deprivation, under color of state law, of the rights secured by Acts of Congress providing for equal rights of persons within the jurisdiction of the United States.

3. Plaintiff seeks declaratory relief pursuant to 28 USC §2201 and §2002.

4. Plaintiff's claims for injunctive relief are authorized by 28 USC §2283 and §2284 and Rule 65 of the Federal Rules of Civil Procedure.

5. The Middle District of Pennsylvania is an appropriate venue under 28 USC §1391 (b)(2) because it is where the events giving rise to this claim occurred.

## III. PREVIOUS LAWSUITS BY PLAINTIFF

6. Plaintiff has filed no other lawsuits dealing with the same facts set forth in this action or otherwise relating to his imprisonment.

## IV. PLAINTIFFS

7. Plaintiff, John Wayne Cessna (reffered herewithin as Plaintiff) is and was at all times mentioned herein a prisoner of the State of Pennsylvania in the custody of the Pennsylvania Department of Corrections (PA DOC), currently confined in SCI-Waymart, Waymart, Pennsylvania.

## V. DEFENDANTS

8. Defendant, Robin M. Lewis (Lewis) is the Chief Hearing Examiner of the Pennsylvania Department of Corrections. He is legally responsible for all

inmate final appeals handled in the Pennsylvania Department of Corrections at SCI-Camp Hill, Camp Hill, Pennsylvania.

9. Defendant, Wayne J. Gavin (Gavin) is the Superintendent of SCI-Waymart. He is legally responsible for the operation of SCI-Waymart and the welfare of all the inmates housed in that prison located in Waymart, Pennsylvania.

10. Defendant, Ronda Ellett (Ellett) is the Deputy Superintendent of Facilities Management (DSFM) and is a member of the Program Review Committee (PRC). She is responsible for Unit Management and facility security at SCI-Waymart.

11. Defendant, Paul M. DelRosso (DelRosso) is the Deputy Superintendent for Centralized Services (DSCS) and is a member of PRC. He is responsible for medical and mental health care, Correctional Industries, education, activities, and food service at SCI-Waymart.

12. Defendant, Laura Banta (Banta) is the Corrections Classification and Program Manager (CCPM) and a member of PRC. She is responsible for inmate records, activities, volunteers, religious programs, inmate employment, and treatment programs at SCI-Waymart.

13. Defendant, Edward Kosciuk (Kosciuk) is a Major of the PA DOC and a member of PRC. He supervises all facility Correction Officers and the Unit Management Teams assigned to each housing unit located at SCI-Waymart.

14. Defendant, Michael Murphy (Murphy) is a Unit Manager and a member of PRC. He has at all times mentioned in this complaint, held the rank of Unit Manager and was assigned to SCI-Waymart.

15. Defendant, Lori White (White) is a Unit Manager for the Unit three housing units and is a member of PRC. She is a supervisor for Correctional Officers Berkoski and Driver. She has at all times mentioned in this complaint, held the rank of Unit Manager and was assigned to SCI-Waymart.

16. Defendant, Joseph Vinanski (Vinanski) is the Corrections Superintendents Assistant and Grievance Coordinator for the PA DOC. He is responsible for

processing grievances from staff and inmates. He has at all times mentioned in this complaint, held the ranks of Corrections Superintendents Assistant and Grievance Coordinator and was assigned to SCI-Waymart.

17. Defendant, Anne Plaksa (Plaksa) is a Hearing Examiner for the PA DOC who, at all times mentioned in this complaint, held the position of Hearing Examiner (HEX) and was assigned to SCI-Waymart and SCI-Retreat located in Hunlock Creek, Pennsylvania.

18. Defendant, Duane Dobbs (Dobbs) is a Captain in charge of security for the PA DOC. He is a supervisor for Lt. Smith and Correctional Officers Shiffer and Wertman. He at all times mentioned in this complaint, held the rank of Captain and was assigned to security at SCI-Waymart.

19. Defendant, Michael DeLucy (DeLucy) is a Lieutenant and a member of PRC. He has at all times mentioned in this complaint, held the rank of Lieutenant and was assigned to SCI-Waymart.

20. Defendant, Raymond Stender (Stender) is a Lieutenant in charge of the Restricted Housing Unit (RHU) for the PA DOC. He at all times mentioned in this complaint, held the rank of Lieutenant and was the supervisor for all of the RHU staff. He was assigned to the RHU at SCI-Waymart.

21. Defendant, Jody Smith (Smith) is a Lieutenant for the PA DOC who, at all times mentioned in this complaint, held the rank of Lieutenant and was assigned to security at SCI-Waymart.

22. Defendant, Rodney Quinn (Quinn) is currently a Lieutenant for the PA DOC who, at all times mentioned in this complaint, held the rank of Sergeant. He was promoted during the course of this complaint and was assigned to the RHU at SCI-Waymart.

23. Defendant, David Evans (Evans) is a Sergeant for the PA DOC who, at all times mentioned in this complaint, held the rank of CO2 and was assigned to the RHU at SCI-Waymart.

4

24. Defendants, Mark Berkoski (Berkoski) and Luciano Driver (Driver) are Correctional Officers of the PA DOC who, at all times mentioned in this complaint, held the rank of CO1 and were assigned to the D-1 Housing Unit, Unit 3, at SCI-Waymart. They were under the direct supervision of Lori White during the course of this complaint.

25. Defendants, Tim Shiffer (Shiffer) and Kevin Wertman (Wertman) are Correctional Officers of the PA DOC and members of the security search team as of this complaint. They at all times mentioned in this complaint, held the rank of CO1 and were assigned to security under the supervision of Duane Dobbs and Jody Smith at SCI-Waymart.

26. Defendants, Chad Shuman (Shuman), David Spry (Spry), Karl Keller (Keller), and Bryan Martin (Martin) are Correctional Officers for the PA DOC who, at all times mentioned in this complaint, held the ranks of CO1 and were assigned to the RHU at SCI-Waymart. They are under the direct supervision of Quinn and Evans who are under the direct supervision of Stender.

27. Each defendant is sued individually and in his [or her] official capacity. At all times mentioned in this complaint each defendant acted under color of state law.

## VI. STATEMENT OF FACTS

28. On January 28, 2012 Plaintiff was searched by correctional officers Shiffer and Wertman.

29. Plaintiff was asked whether he had any contraband and stated "NO."

30. Upon searching, the officers found "blank forms" which were requests slips to staff intended for inmate use and were copied while the inmate was at Camp Hill and had been paid for by the Plaintiff. The officers also found a "yellow piece of paper" with the words "block count, white, black, hispanic, and totals" written on notebook paper.

31. When questioned, Plaintiff informed the correctional officers that he

was re-doing the block count sheet for the D-2 block officer, Rosie Hernandez CO1, to send to the print shop.

32. The officers started to harass the plaintiff about this yellow paper and the extra box which he had been given permission for from the Unit Manager, White. (Exhibit 3)

33. The Correction Officers (CO) used derogatory words referring to the plaintiffs homosexual life style in the presence of inmates Peterson and Guzman. (Exhibit 49)

34. Plaintiff was later called down by area Sgt. Heller, for questioning on the C-1 Housing Unit.

35. Plaintiff explained to Sgt. Heller about the box and the yellow piece of paper and was sent back to his block because it was the weekend and nothing could be confirmed by the Unit Manager, White.

36. On Monday, January 30, 2012 the plaintiff approached White about the search that was performed on Saturday, January 28, 2012 and informed her of the yellow paper and the issue concerning the extra box.

37. White gave the Plaintiff documentation for the extra box which stated she was aware of it and that it was for educational purposes. This was later confiscated by Wertman, and was also documented by an email from White. (Exhibit 3)

38. After receiving documentation from White the Plaintiff returned to his block where he was directed by his block officer to report to the security office.

39. Upon entering the security office, the Plaintiff was met by Wertman. Plaintiff gave Wertman the documentation for the extra box when he requested it.

40. Upon reading the document, Wertman became outraged and started swearing

at the Plaintiff because the document had that Mondays date and stated that
it was for educational purposes. Wertman continued to rant at the Plaintiff
because of the date and because he stated "she can't give permission for
an extra box for education, only for law work and even that is suppose to
only come from the Superintendent." Wertman then sent the Plaintiff back
to his block but kept the document with him and told the Plaintiff if he
was lucky he may get it back later that day.

41. At no time was the Plaintiff asked about the yellow piece of paper during
this meeting or the blank request forms. (See Par. 30 and 40)

42. Later that day after lunch, the Plaintiff was directed to stay-in from
yard and then was escorted from the D-2 Housing Unit to the RHU.

43. Upon receipt of misconduct B462330, Plaintiff observed that CO's had
lied on the form. (See Exhibit 1 and Par. 44)

44. Wertman and Shiffer both stated "plaintiff does the block logs and
paperwork for the block officer" and that "plaintiff could not provide
documentation for the extra box" he had in his possession. (Exhibit 1)

45. On February 2, 2012 Plaintiff saw the HEX, Plaksa, for the first time
and opted to waive the hearing so that more information could be obtained.
(Exhibit 2)

46. During this time period Plaintiff wrote requests to the Unit Manager,
White, which she replied to with nasty remarks and he also spoke with Smith
and another Lt. about the incident. Plaintiff does not remember the name
of the second Lt..

47. On February 21, 2012 information was provided by Smith that the Plaintiff
did have permission to redo the desk-top forms for the block officer.
(Exhibit 3)

48. On February 23, 2012 Wertman was sworn in for testimony. (Exhibit 3)

49. Wertman presented an email from White containing information that the Plaintiff was given permission to have an extra box for educational purposes. (Exhibit 3)

50. The HEX dismissed all of the charges with prejudice (DWP). (Exhibit 3)

51. Even though these charges were DWP, they were sufficiently adverse because they subjected the Plaintiff to punitive segregation and to the risk of substantial sanctions by the HEX if found guilty.

52. Plaintiff was later informed by Shiffer that the only reason Plaintiff received the misconduct was because Wertman was trying to get the D-2 block officer, Hernandez, whose new married name is Rosanna McGrantham, terminated because he did not like her.

53. During the investigation Plaintiff told Lt. Smith that he had used an example for doing the desk-top forms from looking at CO Russian's CO1 paperwork on the E-2 Housing Unit. Plaintiff informed Lt. Smith he could not really use everything from CO Russian's paperwork because he takes his home and does it on his computer as the Plaintiff was informed by the E-2 block officer on duty. Shortly after Plaintiff was released from the RHU.

54. It should be known to this Court that shortly after the Plaintiff was released from the RHU, that CO Russian was taken off the job as a block officer for the E-2 Housing Unit and moved to a rover position. (Exhibit 48)

55. Upon leaving the RHU, Plaintiff was stopped by Wertman and Shiffer as well as other RHU staff and was instructed not to talk about anything that transpired and that Wertman did not have to "provide" the email from the Unit Manager, White, that had cleared him.

56. Plaintiff was instructed to "let everything go and not file any grievances if he knew what was good for him." He was informed that they were doing him a favor but that his stay could just have easily lasted longer.

57. Upon discharge from the RHU, Plaintiff was sent to the C-1 Housing Unit.

58. Plaintiff would also like this Court to know that all of his requested witnesses were denied by the HEX as well as assistance for the above mentioned misconduct, B462330. The HEX, Plaksa stated "HEX denied - not necessary to determine guilt of innocence." (Exhibit 4)

59. On February 28, 2012 Plaintiff was moved from the C-1 Unit to the D-1 Housing Unit.

60. After moving onto the D-1 Unit, Plaintiff was forced in a threatening manner to stand against the wall in front of the CO's desk and made to wait 30-40 minutes.

61. Upon information and belief provided by other inmates, both heterosexual and homosexual as well as the Plaintiff and some sex offenders, this was to designate the Plaintiff as either being gay or a sex offender and that he was to be considered an open target to the other inmates on the block. It should be brought to this Courts attention, that of all the inmates that moved to D-1 with him, he was the only one forced to stand against the wall.

62. Upon information and belief, Plaintiff was told of different instances that have happened to other inmates as a result of being housed on the D-1 Housing Unit, some of which include beatings, commissary being stolen, and water being pored down the backs of TV's and radios. (Exhibits 43, 44, 45, 46 and 53)

63. Upon personal knowledge, Plaintiff has heard of some of the fights as well as prison officials removing one of the CO's from the D-1 unit whose name was CO1 Bochinski (BO), to try and restore some order. Plaintiffs biggest observation was when prison officials had to remove nineteen inmates from D-1 and put them on other blocks and vise-versa so as to split up the trouble makers that Berkoski and BO had made because to many people were getting beat up and such. These inmates were doing all of this at the direction and approval of these CO's as has been a long and established practice towards gays and sex offenders that are subjected to being placed on D-1.

64. While the Plaintiff stood along the wall with his property, he observed other inmates moving onto the block being allowed to put there property away without having to stand forcibly on the wall.

65. Plaintiff was then instructed by Berkoski that he was not allowed to ask him for anything; that he was to have other inmates ask for him and that if he needed anything from the Plaintiff he would send another inmate.

66. Berkoski originally instructed the Plaintiff that he was to also have another inmate sign him in/out on the housing tracking sheets, for yard and that if he had any mail he would send another inmate to deliver it. Plaintiff was also to have another inmate check the block call-out sheets and to obtain any other paperwork that he may have needed while Berkoski was working which violates the DOC policy of inmate accountability. These policy numbers are not available to the Plaintiff though requests for them have been made to staff. They continue to inform the Plaintiff that they are policy, whether its DOC policy or Institutional policy remains unclear for certain.

67. It is the Plaintiffs belief that he was not being treated equally and that Berkoski was violating his individual rights that all prisoners are given upon entering the PA DOC and that by doing this he violated the Departments Code of Ethics by discriminating and not avoiding situations whereby bias, prejudice, or personal gain could influence his official decision. (Exhibit 47)

68. At this time plaintiff was on no disciplinary restrictions. He was also instructed to stay on his bed without being given notice or a hearing as to a reason for these sanctions.

69. Berkoski stated "you are on this block, D-1, as punishment, because the HEX did not do her job correctly," in reference to misconduct B462330, which was DWP. (Exhibit 1 and 3)

70. It is upon this Plaintiffs personal knowledge from talking with Berkoski in the beginning that he did not like the Plaintiff because he was gay, considered him a sex offender, and a "trouble maker" because of the above mentioned misconduct and the grievances he had previously filed against other

staff members. (See Par. 69)

71. Berkoski's invasion of the Plaintiffs personal space placed him in a
threatening situation which caused him to be intimidated and degraded as
a human being to the surrounding inmates on D-1.

72. Berkoski continued to use obscene language while yelling at the Plaintiff
two inches from his face, invading his personal space with his fist clenched
while at the same time defiling and defaming his character in front of the
D-1 Unit's inmate population.

73. On February 29, 2012 Plaintiff stopped a member of his Unit Management
Team, Mr. Chapel (Chapel), to request a separation on Berkoski for the ongoing
abuse ad mistreatment.

74. Chapel informed the Plaintiff's counselor, Mr. Marsico (Marsico), and
the Unit Manager, White, of the situation.

75. Plaintiff was called to the Unit Managers office and expressed his
situation and concerns to his Unit Management Team which consisted of White,
Marsico, and Chapel and his desire to be moved to a safer block as well as
to obtain a separation against Berkoski.

76. Plaintiff was told nothing could be done and that he should file a
grievance.

77. Plaintiff was informed by White that he was "not permitted to have a
separation against one of her staff members." Plaintiff believes separations
are handled under security policies and procedures of which inmates have
no access. They can be implemented in any DOC Institution and at any time
they are required.

78. Upon leaving the office Plaintiff proceeded to the officers desk and
asked CO1 Bronson (Bronson) for an official grievance as directed to do so
by White. (See Par. 76)

79. On the afternoon of February 29, 2012 second shift was ran by Driver.

80. Plaintiff started to go to see Driver but before he could make it to the desk was stopped by him then instructed not to come any closer. Driver said that after talking to Berkoski, who is the main block officer that for the Plaintiffs own safety he should stay away from him and his desk if he knew what was good for him, and follow the same instructions that Berkoski had issued.

81. That evening on the way to medication line Plaintiff observed security Capt. Dobbs talking with CO1 Bell (Bell). Plaintiff stopped and asked to speak to them of the situation he was faced with on D-1 to see if they could be of any help.

82. Capt. Dobbs informed the Plaintiff that he could receive a separation against staff members for the above mentioned issues and that the issues he was dealing with should not be occuring.

83. Plaintiff explained to Capt. Dobbs and Bell that he did not want to cause any trouble for Berkoski, Driver, or White, but that he only wanted to be moved so that he did not have to deal with the mistreatment, abuse, and stress he was suffering from.

84. Upon explaining the situation, Capt. Dobbs instructed the Plaintiff to contact Lt. Smith because he knew about the first misconduct that took place and he was the one involved with the investigation for that misconduct. (See Par. 43-47)

85. After returning from medication, Plaintiff submitted a DC-135A Inmate Request to Staff, to Lt. Smith informing him of the situation as per security Capt. Dobb's direct order.

86. On March 5, 2012 the Plaintiff was called to the CO's desk by Berkoski. He proceeded to sit in a menacing manner behind his desk as the Plaintiff came forward. At this time he informed the Plaintiff he knew that he had been going around behind his back to his supervisors about the was he was treating him.

87. Berkoski stated that he would allow the Plaintiff to start collecting his own mail from that point on but that he was still expected to have another inmate do everything else that required, consisting of his passes, sign-in/out, call-outs, etc..

88. Berkoski then threatened to "nail the Plaintiff to the wall and make his life a living hell if he filed a grievance or called the abuse hotline," constituting a verbal threat in violation of DOC policy DC-ADM 001 (1)(c). He also instructed the Plaintiff to stop contacting people about the abuse and mistreatment that was taking place on D-1 because "no one has done anything in the past to stop it and no one is going to stop it now." (Exhibits 6, 43, 44, 45, 46, 48, and 53)

89. Berkoski also informed the Plaintiff "he can do anything he wants because he goes fishing with all the Captains and Lieutenants" and that "they will always take his side." This is the reason the Plaintiff believes why no investigations in the past have fazed him. (Exhibits 6, 48, and 49)

90. It is because of these statements made to the Plaintiff by Berkoski, that these affiliations show without a doubt that the supervising officials involved, knowingly permitted the continuing customs and/or policies that resulted in the abuses and mistreatments of the the Plaintiff and previous inmates. (Exhibits 43, 44, 45, 46, 48, 49, and 53)

91. Plaintiff believes these supervising officials had the contemporaneous knowledge of the incidents in question and the knowledge of prior patterns of similar incidents and that by their inactions to correct the on-going wrongs it ultimately communicated the message of approval to thier offending subordinates.

92. It is upon information and belief that Berkoski has a record that contains numerous complaints.

93. Plaintiff tried to reason with Berkoski and to explain he had a serious medical condition, and that he was not suppose to be under any undue stress because it affects that condition. Berkoski responded that he was already

aware of the Plaintiffs medical conditions. (Exhibit 48)

94. Upon information and belief, Plaintiff believes that during this discussion Berkoski's comment of his medical condition was loud enough for other inmates to hear, placing the Plaintiff in a potentially dangerous and a strenuously stressful situation form the surrounding inmates effecting his medical condition.

95. Plaintiff believes that his medical information was obtained through illegal transactions and breach in medical privacy either through the medical staff or by using the computer systems in the RHU by CO1 Martin, violating the Health Insurance Portability and Accountability Act (HIPAA). The PA DOC is a "cover entity" under HIPAA because it provides health care and transmits records electronically and therefore is subject to HIPAA restrictions. Defendants are also in violation of the Departments Code of Ethics. Plaintiff believes this was done the same way the defendants accessed inmates criminal records or through medical staff as discussed in Santos River's declaration. Plaintiff was also present in the RHU when the RHU staff would read other inmates as well as his own criminal records over the loud speaker to try and cause problems and to keep from becoming bored. (Exhibits 46-49)

96. In 2006 Plaintiff was diagnosed with HIV in Dade County Florida.

97. Upon entering the prison system in 2009 at the Clarion County Jail, Plaintiff was taken to an outside HIV doctor and had a CD4 count of 124 at which time he was reclassified with an AIDS diagnosis and required immediate medical treatments and medications. (Exhibit 48)

98. Berkoski also informed the Plaintiff "to expect the worst retaliation he could if he tried anything else and that he was not allowed to move from his bed or he would be sorry."

99. After the conversation with Berkoski was over he threw a request slip in the Plaintiffs face and forcing him to have to bend down and pick it up off the floor. Berkoski then stated "get the fuck back to your bunk and stay there."

100. Plaintiff at this point was in a constant state of fear for his safety and his life as the undue stress can have a detrimental affect on the CD4 count from his continuing medical illness which is already considered a terminal illness as a result of the AIDS classification. As a result, the psychology department had to place the Plaintiff on medication for anxiety for a mental break down in psychiatrist Diane Latika's office after finding out his CD4 took a drastic drop and his kidney function had also fallen below the standard level for normal kidney functions. As a result of this, the Plaintiffs combination for his HIV medications had to be changed, leaving him with fewer drug combinations to fight off the AIDS virus and a real possible threat of a shorter life expectany since once you run out of drug combinations there is no longer an effective way to treat the virus resulting in a slow and very painful death. (Exhibit 48)

101. As a direct result of the stress, abuse, and mistreatments performed by priosn officials and the inactions of their superiors to alleviate those malicious actions, Plaintiff's CD4 count dropped from 752 on January 23, 2012 to 392 on April 26, 2012 which consisted of with the Plaintiff's time in the RHU and resulted in making him more susceptible to a long range of autoimmune infections and illnesses which could have resulted in his untimely death.

102. On March 7, 2012 the Plaintiff was approached by several inmates in yard, two of which were inmates Evans and Pack, and was asked if he was HIV+.

103. It is the Plaintiff's belief that the rumors of his HIV+ status started as a direct result of Berkoski, not only to label him as another target and put him in more danger, but also to try and segregate him from the rest of the general population.

104. Plaintiff also talked with CO1 Spataro (Spataro) about the mistreatment that was going on. Having seen the problems and having personal knowledge of Berkoski's reputation, Spataro told the Plaintiff she would try to "make a move" to have the Plaintiff moved else where but was unable to do so. She was also suspended later on for other reasons and it is the plaintiff's belief that her involvement into his situation may have helped with her being placed

on suspension as this transpired while he was housed in the RHU.

105. Later that day the Plaintiff filed a grievance against Berkoski and started working on filing complaints with the clerk of court in Wayne County. (Exhibits 5-8)

106. On March 13, 2012 Plaintiff mailed criminal complaints by certified mail to the clerk of courts in Wayne County against defendants Berkoski, Driver, and White, all from the Unit 3 Housing Area. (Exhibits 6-8)

107. On March 16, 2012 at the start of third shift, Plaintiff was called to the CO's desk at 2345. He was instructed to go and wait in the day-room. Soon after he was approached by CO1 Outland (Outland), who was the rover for D-1 and CO1 Beltran (Beltran) the third shift officer. He was then issued a DC-141 misconduct, B274040, with Berkoski's signature as the reporting/issuing staff member. (Exhibit 9)

108. On misconduct B274040, Berkoski accused the Plaintiff of not sitting-up/sleeping for the 2130 count and disobeying a direct order. At no time was the Plaintiff lying down during count and Berkoski never said one word to the Plaintiff then or any other time and was also witnessed by the other D-1 inmates. (Exhibit 49)

109. The misconduct stated that this was the third offense in three weeks and that it was marked on the quarters card. Plaintiff had viewed his quarters card entries before the misconduct was issued with CO1 Wolf (Wolf) from the morning shift and there were no incidents of this nature marked. Since the Plaintiff was only on the D-1 Unit for about two weeks he believes that Berkoski falsified the entries in an attempt to falsify evidence in order to get a guilty verdict from the HEX. It should also be brought to this Courts attention that the inmate quarters cards are considered official state documents initiated by the PA DOC and have an effect on inmate classifications whereby falsifying there entries can lead to major sanctions aginst the inmate.

110. Plaintiff was not allowed to talk or interact with Berkoski per his direct orders as discussed above. (See Par. 65)

111. Upon information and belief of the Plaintiff is that Berkoski falsified the quarters card entries. Plaintiff reviewed the cards on March 17, 2012 with Wolf present. The Court should know that when the cards are viewed the CO makes an entry on the card that the inmate reviewed them. This entry was no longer present on the cards. All of the new entries on the card are in a single row with the exception of derogatory statements added to the mix to make the Plaintiff look worse. All entries were in the same ink and under alias there were nasty derogatory names aimed towards the Plaintiff's sexual preference. There is also another derogatory statement that involves inmate Alston but it is the belief of the Plaintiff that inmate Alston's quarters card will not reflect the same entry dure to the fact that he was moved to a program block before Berkoski issued the misconduct to the Plaintiff and because no investigation was conducted at least that the Plaintiff was aware of.

112. On March 17, 2012 Wolf was informed of the situation that the Plaintiff was dealing with and notified Lt. Smith when he came into work that morning.

113. Upon information provided by Wolf, was that Lt. Smith admitted he had received the request sent to him by the Plaintiff requesting to be moved but had forgot about the Plaintiff's problem. Lt. Smith informed Wolf that he would see the Plaintiff that day. (See Par. 85)

114. Later that afternoon the Plaintiff was sent to 42nd Street to see Lt. Smith. Upon entering he observed that Capt. Dobbs was also present. He was asked what the problem was and he replied by stating everything that had transpired since he had last spoke with Capt. Dobbs. The Plaintiff then showed them copies of the grievance and complaints he had previously filed as well as explained to them that he had called the abuse hotline. Inmate Pack had also called the hotline but the Plaintiff never received any communication regarding these phone calls. (Exhibit 43 and 48)

115. Plaintiff was then asked why he had filed the complaints and informed them that he had never received an answer from the grievance and that no help was being provided to him concerning his problem, so he chose to exercise his First Amendment rights to petition the government for redress of his

grievances and to use his freedom of speech and express his concerns towards his and others on-going abuse and mistreatment at the hands of prison officials at SCI-Waymart.

116. It is the Plaintiff's belief as discussed earlier that misconduct B274040 was a retaliatory move on behalf of defendants White, Berkoski, and Driver. (See Par. 107-111)
> A prisoner (to state a valid claim for retaliation) must allege:
> 1.) A specific constitutional right
> 2.) The defendants intent to retaliate against the prisoner for his or her exercise of that right
> 3.) A retaliatory adverse act
> 4.) Causation

117. Plaintiff then had to beg to be moved yet again because he was in a constant fear for his health and safety.

118. Capt. Dobbs and Lt. Smith then made a decision to do a security move to protect the Plaintiff from any further wrongs that could or would occur from being in proximity to Berkoski, Driver, White, or any other members of the Unit 3 housing blocks. They informed the Plaintiff that the move should stop any retaliatory moves that they may try but unfortunately nothing about the misconduct could be done and that he would have to explain everything to the HEX, Plaksa.

119. Plaintiff was then moved during the afternoon count on a weekend back to the C-1 intake block and was then escorted back to D-1 by an area Sgt. to collect his property.

120. Soon after Plaintiff received a letter from the Pennsylvania State Police (PSP) on March 30, 2012 informing him that the security office at SCI-Waymart and the Office of Professional Responsibility (OPR) would be performing investigations into the complaint allegations. (Exhibit 31)

121. At no time was the plaintiff ever contacted by OPR pertaining to the above mentioned investigation they were to perform as directed by the PSP.

122. The only knowledge Plaintiff had of any investigation was the one being

performed by the security office at SCI-Waymart, who the Plaintiff believed were biased and covering for their fellow prison officials.

123. At this time Plaintiff also received letters back from the State Attorney Generals Office on April 4, 2012 and from the Department of Justice on March 30, 2012. Plaintiff had contacted them earlier about his on-going situation at SCI-Waymart. (Exhibits 32-33)

124. Plaintiff eventually did a deposition for Lt. Smith. He asked if he should have a lawyer present but was informed one was not needed. He felt at odds and explained his concern to Lt. Smith because he thought that the complaint he filed was basically the same and contained the same information and that a lawyer should be present because he did not trust the prison officials at SCI-Waymart. Plaintiff does not know what became of his complaints concerning White or Driver as they were never discussed in the course of Lt. Smiths investigation.

125. In the original complaint it had mentioned the Plaintiff's mail not being given directly to him. This occurred up until the Plaintiff complained to Berkoski's supervisors, White and Capt. Dobbs. After the Plaintiff was informed by Berkoski that he could receive his own mail and that another inmate would no longer be handling it. (See Par. 65-66 and 87)

126. The Court should take note that on March 2, 2012 a "J-Pay" letter was received by the prison for the Plaintiff from an outside entity. This was a day Berkoski was working. The letter was never delivered by Berkoski or by Driver when he worked on March 6, 2012, but left in the CO's desk. Bronson from the morning shift delivered it to the Plaintiff on the morning of March 7, 2012. (Exhibit 48)

127. Plaintiff informed Lt. Smith that because of Berkoski's statement; "he can do anything he wants because he goes fishing with all of the Captains and Lieutenants" and that "they will always take his side," he did not have any confidence in the investigation being performed by SCI-Waymart's security office or officers because they were good friends with Berkoski. He also wrote his concerns in a letter addressed to James Barnacle, who is the director

of OPR at SCI–Camp Hill located in Camp Hill, Pennsylvania. (See Exhibits 37, 48, and Par. 89)

128. Lt. Smith said there would be no problems with the investigation and told the Plaintiff to leave it alone, that he would take care of everything. He also inquired about any witnesses. Plaintiff was not sure if anyone heard everything that transpired between himself and Berkoski but knew that alot of people were aware in some degree that he was having problems and that he had to have other people do things for him because he was not allowed.

129. Plaintiff was not the only one on the block that was forced to have other people do things for him. There are and were many others in the past that have been removed by either being set-up, beat down, or by receiving false misconducts from these block officers in order to have them removed from the D–1 Unit. (Exhibits 43–46, 48, and 53)

130. Lt. Smith asked for anyone that the Plaintiff believed may have heard of or known about the mistreatment and abuse. Plaintiff provided him with a list of fifteen names. Plaintiff also informed him hat he was told by various inmates that some of them had also called the abuse hotline about the mistreatment and abuse. Plaintiff also informed Lt. Smith that a magnitude of inmates have seen or knew of other inmates that suffered at the hands of these prison officials to no avail. (Exhibits 43–46, 48–49, and 53)

131. Plaintiff was also informed by inmates McCoy and Dixion, who are homosexuals and were at one time placed on the D–1 Housing Unit, about their individual mistreatments and abuses and how they had been removed.

132. Inmate Evans, another gay individual, told the Plaintiff of how other gays and sex offenders were treated on D–1.

133. Plaintiff was told personally by inmate Nate McCoy that he himself had had to call the sexual abuse hotline against Berkoski in order to get a separation and be removed from D–1. This Plaintiff was present on the D–2 Housing Unit when they did a massive block move which was discussed earlier and witnessed them trying to place Nate McCoy back on the D–1 Unit were he

had his separation with Berkoski. Inmate McCoy was there less then two weeks, continuously asking the Unit Manager, White, to remove him from the block because he had the separation with Berkoski and was again having problems. Inmate McCoy was then moved to the E-1 Housing Unit then later on to L-2, off of Unit 3 completely. Plaintiff was informed by CO1 Knight that White had caused so many issues and had let the D-1 Housing Unit get so out of hand that he thought she was going to cause a riot and threatened to let her finish the moves by herself. (See Par. 63)

134. Plaintiff never received a response from James Barnacle at OPR as mentioned above and is not sure if his letter made it out of the institution. (See Par. 127)

135. Plaintiff also informed Lt. Smith that he not only sent complaints to the District Attorney but also to the State Attorney General's Office and a letter to the Department of Justice in Washington, D.C.. When asked why, he informed Lt. Smith that he wanted people to know about the abuse and that since nothing was being done internally to correct it and the mistreatments he did not know who else to write too for help so he wrote everyone he could think of that may have been able to help. At this time Lt. Smith stated not only was the Plaintiff making things harder for him to do his job, but that it could make things worse for the Plaintiff in the end.

136. On Monday March 20, 2012 Plaintiff was called from the C-1 Unit to the Unit Managers office of White. Plaintiff passed inmate Stokes who works across from White's office as a south corridor worker. Plaintiff had sat down with White and was asked why he had to have a security move done on the weekend and why she had to be informed by security of the move and the complaints he had filed against her and her staff. Plaintiff then tried again to explain to her about his mistreatment and abuse at the hands of her staff and about the complaints.

137. Plaintiff then informed White that he did not think he should be talking to her because of the complaints that were filed and because of the on-going investigation. She then started to become irate with the Plaintiff over the situation. At this point the Plaintiffs's counselor came into the office, Marsico, so he could try to understand what had transpired. He sat back and

watched while White tried to tell the Plaintiff why it was not abuse and
that he had no right to use the courts to file his complaints. She stated
that he was only allowed to use the grievance system the PA DOC provided
and that the courts would not do anything because he did not file a grievance
first. While telling the Plaintiff this she spoke in a loud voice intending
to intimidate the Plaintiff and "swore up and down like a truck driver" as
inmate Stokes told the Plaintiff later upon leaving her office. Inmate Stokes
was able to hear through a closed door and from across the hall. The Plaintiff
had also informed White that he had filed a grievance but no response was
ever given. Since the grievance was never answered the Plaintiff considered
it denied and moved on to other appeals and procedures available to him.
(See Exhibits 5, 48, and Par. 74-76)

138. The Plaintiff explained he had also called the abuse hotline, talked
to Capt. Dobbs, Lt. Smith, other inmates, and other CO's. He explained he
never received a response from the abuse hotline either. (Exhibits 43 and
48)

139. Plaintiff's parents were concerned enough that they made several phone
calls to White about his situation with Berkoski and even asked if she would
rather talk to a lawyer instead. Every time his parents called they were
directed to White by her secretary, even when they asked to talk to the
Superintendent.

140. The Plaintiff talked to inmate Stokes on his way back to C-1. (See Par.
136-138)

141. On March 22, 2012 the Plaintiff was brought before the HEX, Plaksa,
for misconduct B274040 issued by Berkoski in retaliation for the criminal
complaints filed by the Plaintiff. Plaintiff explained everything to the
HEX that was happening since she had dismissed misconduct B462330 which was
dismissed with prejudice. He informed her that it was his belief that it
was retaliation for the complaints against White, Driver, and Berkoski. The
Plaintiff then begged the HEX to help him with his situation and the on-going
retaliation.

142. The HEX then found the Plaintiff guilty and he was given fifteen days

cell restriction. It was then explained to the Plaintiff that she found the guard to be more creditable since it was the first formal misconduct Berkoski had written on the Plaintiff. (Exhibit 11)

143. It should be brought to this Courts attention that "I found the officer to be more creditable then the inmate" is almost always the answer the HEX, Plaksa, gives showing a pattern or practice which is used to sanction inmates. (Exhibit 11)

144. Plaintiff tried again at this time to raise the retaliation issue by explaining the three concepet that must be shown to prove retaliation under the law in Pennsylvania:
    Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001)
    1.) A prisoner must allege constitutionally protected conduct
    2.) Adverse action
    3.) A causal link between the two
The HEX refused to hear about any retaliation or the concepts that were at this point met to prove the retaliation standard.

145. As usual, Plaksa denied all the witnesses, which is the same for all witness forms the Plaintiff has ever submitted to her. She also denied requests for assistance as she usually does. (Exhibits 1-4, 10, and 16)

146. Upon information and belief of the Plaintiff is that Plaksa almost always denies witnesses and requests for assistance on every inmates DC-141 Part 2A forms that are submitted. Her reasoning is found in her own words "HEX denied – not necessary to prove innocence or guilt." (Exhibits 4, 10, and 16)

147. On April 17, 2012 the Plaintiff was instructed by CO1 Byers, a block officer for C-1, that he was to go to see Lt. Smith down at medical near the office he normally uses.

148. Plaintiff made it as far as 42nd Street and was detained and brought to the RHU without a reason. Later that night he was given a misconduct, B467957, which only stated he was being placed in the RHU under Administrative Custody (AC) status. (Exhibit 13)

149. Plaintiff was also brought down to the RHU with another inmate, Francisco Sosa, JZ-2866, who was also filing legal work against SCI-Waymart prison officials.

150. Upon being placed in the RHU both inmates were given a separation order against each other for no discernible reason. It was later taken away without any explanation.

151. Plaintiff had also wrote to Lt. Smith but never received a response in return.

152. Plaintiff then began writing the RHU Sgt.'s Evans and Quinn, about obtaining his legal materials from his property. These legal materials pertained to his complaints and also had various contact information for the officials he had originally had tried to contact for assistance: Clerk of Courts, State Attorney General, and the Department of Justice as well as the PSP and OPR.

153. Plaintiff also started requesting to have his yard time so he could exercise which was a major requirement of his medical condition. He was forced to choose between yard and law library by Quinn and Evans and when he would chose yard he still would not receive it. Usually they would just take him to the law library if even that. Even when the plaintiff signed-up for yard only, he did not receive it. Martin, Keller, Spry, and Shuman were in charge of taking down the names of the inmates requesting yard. Afterwards they would give the list to the Sgt. on duty.

154. Upon information and belief of the Plaintiff is that this was done as further retaliation because he had filed criminal complaints against prison officials and because of his sexual preference and crimes. Plaintiff also believes that no inmates that are considered sex offenders are given yard while in the RHU. He feels that because of this it should be considered cruel and unusual, shows discrimination towards a specific class of people and that no human being should be forced to endure these types of punishments and mistreatments. Plaintiff has also witnessed RHU staff tormenting sex offenders and the mentally disturbed by not feeding them and broadcasting their cases over the loud speaker for everyone to hear so that the other

inmates will sit there and constantly harass and beat on the sex offenders walls to keep them from sleeping. Plaintiff has also watched RHU staff withhold showers and any type of clothing or blankets then turn the AC all the way up so as to freeze the inmates.

155. Plaintiff was awakened every morning around 4:00 AM by medical personnel and was still awake to ask for yard when first shift comes around to take down the names for the yard list and to do the inmate count at 6:05 AM. Plaintiff always heard the RHU staff state "we'll get right on that" in reference to anything he asks for.

156. Plaintiff feels he is not receiving equal treatment afforded to all prisoners and that he is being discriminated against for his crimes and sexual preference.

157. Plaintiff also informed the members of PRC, Ellett, DelRosso, Banta, Maj. Kosciuk, White, Murphy, and Lt. DeLucy, as well as Superintendent Gavin about everything that was transpiring and that he believed the misconducts were retaliatory in nature for him filing the complaints on their fellow co-workers. PRC informed the plaintiff they could do nothing about the situation until he had seen the HEX and she had made a decision.

158. It should be brought to this Courts attention that PRC normally consists of Banta, DelRosso, Ellett, and Maj. Kosciuk as the main members. They also have a different Unit Manager, Sgt., and Lt. that switch every so often within the group.

159. On April 24, 2012 the plaintiff received misconduct A335634, which stated it was a "result of an on-going investigation from March 17, 2012," the day they plaintiff reported to Lt. Smith and Capt. Dobbs of the abuse and mistreatment by Berkoski. (See Exhibit 14 and Par. 112-119)

160. The charges for the misconduct were: No. 42 Lying to an employee and No. 26 Any violation of the PA Crimes Code not set forth above. (Exhibit 14)

161. Lt. Smith listed Title 18 Pa CSA §4904, false reports to law enforcement authorities, as the violation to the PA Crimes Code. Plaintiff did not contact the PSP but instead had filed with the clerk of courts in Wayne County which is part of the judiciary branch not the executive in an attempt to exercise his rights. Plaintiff believes the DA's office contacted the PSP in order to further investigate the legitimacy of the plaintiff's allegations which they have the authority to do so if they believe it is necessary.

162. It was the belief of the Plaintiff that his First Amendment rights allowed him to access the courts, express his freedom of speech, and the ability to petition the government for redress of his grievance. To note, these complaints the Plaintiff filed on the defendants were only submitted after the PA DOC failed to protect the plaintiff from the abuse and mistreatment caused by the defendants which was further allowed to continue by the ignorance and neglect of their supervisors even after they themselves were made aware of the Plaintiffs situation.

163. Under the PA DOC, abuse allegations (DC-ADM 001) No. 1 states that "The Department does not permit any inmate to be subjected to abuse. All allegations of abuse are thoroughly investigated. Abuse includes:
   a.) the use of excessive force upon you;
   b.) an occurrence of unwarranted life-threatening act against you;
   c.) a verbal or written threat to inflict physical injury directed toward you; and/or
   d.) sexual contact.
(See Exhibit 35 and Par. 56, and 88)

164. DOC policy under grievances (DC-ADM 804) on page 13 of the Inmate Handbook No. 10 states "All grievances and appeals must be in good faith and for good cause. You will not be punished or otherwise sanctioned for good faith use of the grievance system." It is the Plaintiffs belief that since the meaning of grievance is "the complaint itself" as defined by Blacks Law Dictionary, that by him filing a formal complaint with the court that it too should be governed under the DOC's own grievance policy as it pertains to them since they failed to act in the protection of the Plaintiff. (Exhibit 35)

165. Plaintiff believes the defendants violated DC-ADM 804 policies and the the PA DOC Code of Ethics. (Exhibits 35 and 47)

166. Berkoski's statement of "nail him to the wall" and Drivers statement of "the plaintiff should stay away from him and his desk for his own safety" is a direct violation of the DC-ADM 001 policy found in the Inmate Handbook and the Departments Code of Ethics. (Exhibits 35 and 47)

167. Misconduct A335634 also stated the Plaintiff supplied a list of nine inmate witnesses. This is wrong, the Plaintiff supplied fifteen inmate witnesses and informed Lt. Smith that other CO's were aware of what was transpiring on D-1 in the deposition provided to him. (Exhibit 12)

168. Upon information and belief of the Plaintiff is that Lt. Smith only interviewed nine witnesses out of the fifteen. Plaintiff believes that this was done purposefully to prejudice or impair the investigation he was to perform for the PSP, interfering with his First Amendment rights and his Fourteenth Amendment right of Due Process. This was a concern that was voiced by the Plaintiff during the course of the deposition with Lt. Smith that he said not to worry about that he would take care of everything. (See Par. 123-130)

169. The deposition states that the Plaintiff received a request slip from Berkoski which was later used to discredit the Plaintiff's complaint in the investigation, yet it was not mentioned that the Plaintiff did not start receiving mail until Berkoski's supervisors were approached and put on notice by the Plaintiff about his abuse of authority. Request slips are not US mail, they are internal memos unlike the J-pay letters sent from an outside entity. (Exhibit 48)

170. It was never mentioned that a J-pay letter that was received on March 2, 2012, a day when Berkoskik worked, was never given to the Plaintiff by him or Driver. It was left in the desk for almost a week and was given to the Plaintiff on March 7, 2012 by the morning shift officer, Bronson. The morning shift does not handle the mail, this is only distributed by the second shift, and a J-pay letter should be considered US mail because it comes from an outside source and is intended to inform the inmate he has received money, or they can contain messages from family and friends. The J-pay center at the time of this incident was located in Miami, Flordia on Biscayne Blvd..

171. Misconduct A335634 is also confusing when it explains the "housing unit tracking sheets." It states that the Plaintiff only signed this form in the presence of Berkoski. This is not true, the Plaintiff only signed the tracking sheet while Berkoski was not around, when the rover was filling in and he was on his break. At all other times another inmate would sign-in/out the Plaintiff as per Berkoski's orders. (See Par. 65-66)

172. Berkoski also stated in the misconduct that the "Plaintiff did have other inmates sign-in/out without his knowledge." This is how they, Lt. Smith, Capt. Dobbs, and Berkoski tried to explain the other hand writings that were present on the tracking forms. (Exhibit 14)

173. Plaintiff would also point out at no time did he ever lie on his complaints that he filed with the clerk of courts; that all the facts set forth were true and correct to the best of his knowledge or information and belief and that this was all that was required by him under the law. (Exhibits 6, 7, and 8)

174. On April 26, 2012 Plaintiff was again taken in front of the HEX, Plaksa. He once again informed her that this was still on-going from the situation as was discussed in the last misconduct hearing. (See Par. 141-146)

175. Originally Plaksa said she could not help the Plaintiff because he went outside the institution to see his remedy. It was the Plaintiff's belief that she was now in a position that could generally help him since security was conducting an investigation as well as OPR according to the letter received by the PSP. (Exhibit 31)

176. Plaintiff informed the HEX, Plaksa, that he thought there was a "conflict of interests" in the investigation. (See Exhibit 15 and Par. 89)

177. Plaintiff then discussed the filing of the complaints with the HEX stated to her "he did not lie" and explained in detail everything to the best of his knowledge and beliefs." Plaksa then requested that the Plaintiff sign another waiver to have more time to review the investigation.

178. Last time this was done, Plaintiff spent almost one month in the RHU with loss of all privileges during that time only to have it dismissed with prejudice. (Exhibits 1, 2, and 3)

179. Plaintiff felt that his statement and the facts involved were "cut and dry" and that this was a retaliatory misconduct in nature based on the fact that the Plaintiff had filed complaints against prison officials. Basically the Plaintiff believes it was "pay back."

180. The HEX could also not find out what misconduct B467957, issued by Lt. Stender, was for, nor did she have copies of the complaints or investigative reports from security which should have been provided to her by Capt. Dobbs and Lt. Smith so that she may have been able to make an informed decision for this current misconduct.

181. The HEX, Plaksa yet again denied the witness request form or the CO's never turned it in. Plaintiff is not sure but believes because he was found creditable in the past by the "dismissal with prejudice" of misconduct B462330, it was in the defendants best interests not to call witnesses. In the end Plaksa believed that because of Lt. Smith's report, that the plaintiff lied to employees and made false accusations against Berkoski. The Court should also be aware that the accusations against White and Driver were again not discussed. (Exhibits 1, 6, 7, and 8)

182. Plaksa found the Plaintiff guilty on both charges without having all the supporting evidence to make an appropriate and informed decision.

183. Plaintiff was given a total of one-hundred and twenty days punitive segregation (DC) status, loss of job effective April 17, 2012, loss of commissary, phone, and yard privileges. (Exhibit 17)

184. Plaintiff was then visited by Chapel, a member of his Unit Management Team, who informed him that most of his witnesses were coming up for parole or pre-release or were already waiting on a bed date. Chapel stated that it was his belief these inmates were scared that they would lose their parole, pre-release, or bed dates it they spoke on the Plaintiffs' behalf. Chapel

told the Plaintiff that he did believe he was being mistreated and abused on D-1 by Berkoski.

185. On April 26, 2012 the Plaintiff appealed the decision on misconduct A335634. (Exhibit 18 and 19)

186. In the appeal the Plaintiff tried to outline to PRC the mistreatment he was suffering from Berkoski and other prison officials.

187. The plaintiff tried to also state his belief that the misconducts filed were "false disciplinary reports against him designed as a form of further retaliatory intent," because he had previously filed complaints outside of the normal chain which the prison officials could not manipulate to their own needs.

188. Plaintiff explained that it was his belief the misconduct was a "false claim" which ultimately ended in a successful effort to subject him to punitive segregation depriving him of life, liberty, and property as well as his basic inmate privileges of phone, yard, TV, radio, commissary, religious services, and human contact. He believes this happened as a result from him filing complaints against prison officials and because he prevailed on misconduct B462330 making some higher prison officials look imcompetent.

189. Plaintiff also explained that it was his impression that Berkoski and Lt. Smith as well as possible others conspired together to unconstitutionally place the plaintiff in segregation for asserting his First and Fourteenth Amendment rights in direct violation of the law.

190. Lt. Smith had told the Plaintiff that he was directed to write the misconduct, but Plaintiff is unaware of who instructed him to do so.

191. Plaintiff would also point out that he did not try to hide the fact that he was filing the complaints and grievance or that he was seriously considering civil action. Plaintiff is housed in dormitory styled blocks, not individual cells.

192. Plaintiff believes that his right of access to the courts applies to to activities leading up to the formal filing of a complaint. He believes that by placing him in punitive segregation with the resulting loss of privileges, was a sufficiently adverse action meant to deter him from exercising his constitutional rights. This was also expressed verbally to the members of PRC.

193. Plaintiff voiced his concerns about prison officials violating his civil rights, both directly by burdening the exercise of his Constitutional rights and indirectly, by retaliating against him for exercising of these rights. Plaintiff has established a continuing "chronology of events" showing retaliatory motive on the part of the defendants.

194. Plaintiff went to the extent to try and add case law that showed his views were aligned with the consensus of others.

195. On May 1, 2012 Plaintiff submitted grievance No. 410520 because he was denied toilet paper when he had run out. It was explained to him that it is provided only on a weekly basis. PA DOC policy, under hygiene states that it is a one for one exchange. When other inmates had run out they were given toilet paper when it was asked for. Plaintiff believes this was further retaliation on the part of the prison officials. (Exhibit 23)

196. Plaintiff was told by multiple RHU officers to use his hand. Plaintiff informed the officers that he had a medical issue requiring and authorizing him to have an extra roll of toilet paper.

197. On May 2, 2012 Plaintiff received an answer that it was upheld in part and denied in part. He was instructed to contact medical if he had a documented medical condition. He tried numerous times to contact Mrs. Salley, the infectious disease nurse, without ever receiving a response from her.

198. It is the belief of the Plaintiff that the requests he had submitted to medical were intercepted by the RHU officers also in retaliation for filing the complaints against the aforementioned prison officials and because grievance No. 410520 was upheld in part overriding the RHU Lt., Stender's,

authority that he possess in maintaining and implementing rules designed
for RHU operations.

199. Plaintiff had spoken with his HIV nurse, Mrs. Salley, later on about
the requests he had sent to her when he saw her during his regular doctor
call and was informed by her that she had never received any such requests
from him since his first visit to the RHU concerning misconduct B462330.

200. Plaintiff had medical documentation originally from Camp Hill for an
extra roll of toilet paper and was told upon arriving at SCI-Waymart that
if he needed more, all he had to do was ask for it.

201. Plaintiff also having received grievance No. 410525 from Mr. Vinansky
decided that because the original grievance on Berkoski was never given a
response to that Mr. Vinansky's answer to this grievance, "all of the
Plaintiff's grievances have been answered," that he would appeal to
Superintendent Gavin. (Exhibits 21 and 22)

202. Upon information and belief that enough time had lapsed Plaintiff
concluded the grievance against Berkoski to be denied. Plaintiff then appealed
to Gavin and was still awaiting an answer from him at the end of June. With
no response, the Plaintiff sent an appeal to the Office of Grievances and
Appeals believing yet again he had given prison officials ample time to
respond. This was done on June 6, 2012. (Exhibits 22, 35, and 38)

203. On May 2, 2012 Plaintiff received a response from PRC denying his appeal.
(Exhibit 24)

204. The members of PRC, that wrote the response, Banta, Murphy, and Lt.
DeLucy stated that "it is more likely you lied and/or exaggerated your
allegations against the CO.." (Exhibit 24)

205. The Court should note that it mentions only a reference to Berkoski
even though the complaints were originally against Berkoski, White, and Driver.
It should also be noted that the investigation the PSP informed the Plaintiff
was to take place involved all three defendants, not just Berkoski. (Exhibits

6-8, 24, and 31)

206. Upon information and belief by the Plaintiff is that Lt. Smith and other prison officials corrupted the investigation they were to diligently and professionally perform for the PSP in order to protect their fellow prison officials form their consequential actions.

207. It is the belief of the Plaintiff that PRC has been biased from the start as indicated by their statement they made on their report. It states, "Additionally, you chose to pursue multiple avenues of direction for your complaint including outside law enforcement agencies." Plaintiff did not contact the PSP, he filed his complaints with the clerk of courts. These were meant to be complaints to the judicial branch not the executive branch consisting of law enforcement agencies, as PRC seems to think. (Exhibit 24)

208. Upon information and belief of the Plaintiff is that the defendants, being duly sworn state employees, under color of state law, proceeded in using multiple state documents to facilitate lies and to aid in the malicious prosecution against the Plaintiff that were sufficiently adverse in their nature because they subjected him to the risk of significant sanctions and also resulted in him being placed in punitive segregation. (Exhibits 1, 9, and 14)

209. It is the Plaintiff's opinion that either the PRC appeal or the appeal to the Superintendent, Gavin, is also corrupt.

210. On the appeal from PRC it is signed by Banta, Murphy, and Lt. DeLucy but above their signatures are Gavin's initials. It is the same with Anthony Alex's, HH-7296, appeal. The Court should note that these appeals are received before the inmates can appeal to Superintendent Gavin. (Exhibits 24 and 52)

211. It is the Plaintiff's opinion that Gavin should not have had any interaction with PRC's response as it may have caused him to be biased or just lazy in regards to reading the appeal later. Other appeals from PRC also appear in this manner. (Exhibits 26 and 52)

212. Upon information and belief of the Plaintiff is that Gavin does this in order so that he does not have to review appeals sent to him directly, thus making his job easier and saving time by only reviewing and having to agree with PRC's decision. Plaintiff feels that this is a violation of him Fourteenth Amendment to Due Process.

213. On May 7, 2012 the Plaintiff submitted grievance No. 411595 because he still had yet to receive his legal property that he had been requesting since April 17, 2012. It was upheld in full on May 10, 2012.

214. The Plaintiff believes this was another attempt to impede and/or otherwise burden the exercise of his Constitutional rights. He also believes this was a blatant attempt at harassment which constituted another sufficiently adverse action intended to deter him from exercising his First Amendment right to access the courts.

215. By withholding the Plaintiff's legal property it deterred him from being able to contact the appropriate people involved in the investigation on the outside. The addresses to contact the DA, OPR, PSP, State Attorney General, and the Department of Justice were all in his legal property as well as copies of the original complaints and grievances. As a result the plaintiff was unable to inform them of what prison officials were doing to throw off the investigation by placing the Plaintiff in segregation or to inform them of what he believed to be malicious prosecution by falsifying state documents. (See Exhibit 48 and Par. 206-208)

216. The plaintiff also could not inform the DA, OPR, PSP, State Attorney General, or Department of Justice about his concerns concerning the possible "conflict of interests" as mentioned earlier. (See Par. 89 and 127-128)

217. After the Plaintiff received his legal work he wrote to OPR and the DA for Wayne County explaining what was going on and asked for assistance in the matter. No reply was ever received and the Plaintiff is not sure if the letters were actually mailed from the facility or intercepted. (Exhibit 27)

218. On May 11, 2012 the Plaintiff appealed to Gavin. This appeal was also denied. Plaintiff pointed out the facts in his appeal to Gavin but since he had initialed PRC's appeal form, Plaintiff is not sure whether Gavin read the appeal directed towards him or not. Gavin never did send a copy of the appeal back to the Plaintiff like PRC did. (Exhibit 28)

219. The Plaintiff had also informed Gavin in his appeal of certain case and state law stating that the PA DOC "is required to establish rules which define expectations and prohibitions for inmate behavior." See Melton v. Beard, 981 A2d 361 (3d Cir. 2009); 37 Pa Code §93.10 (a). This was included because DOC policy states that inmates may include laws and such into the appeal forms. (See Exhibit 26)

220. Plaintiff also listed in his appeal that "a trial court must accept all of the allegations in the complaint as true, and construe the complaint liberally in favor of the plaintiff." See Fed. R. Civ. P. 12 (b)(6). This was mentioned because he believed that they should have followed similar rules if they are stating that you can use case laws. What is the reason for being able to use case law in the appeals if the HEX's do not abide by the rulings. Various Constitutional violations were also mentioned in his appeals. (Exhibits 18 and 26)

221. Upon information and belief of the Plaintiff is that since the outline/ appeal inmate copy was never returned, Gavin did not bother to read it and that since his initials were on PRC's appeal, he only took what they had to say to heart. (See Exhibit 24 and Par. 218)

222. Plaintiff is not sure of the date, but shortly after the appeal to Gavin was denied, he appealed to the Chief Hearing Examiner at Camp Hill, Lewis. Everything was explained in detail with copies of everything discussed in the paragraphs aforesaid provided as exhibits. (Exhibit 29)

223. On May 29, 2012 Plaintiff received a response from the Office of the Chief Hearing Examiner. He was asked to redo the appeal because it was too long. (Exhibit 36)

224. Shortly after, Plaintiff resubmitted the appeal. (Exhibit 30)

225. On June 18, 2012 Plaintiff received the appeal back in the mail and
was informed it contained the wrong address. Plaintiff had used the address
in the Inmate Handbook provided to him by RHU officers. (Exhibit 48)

226. On June 27, 2012 Plaintiff tried to ask to receive yard and explained
he had not been able to receive it since his stay in the RHU. He explained
he had tried numerous times and was denied. Sgt. Evans gave the Plaintiff
yard for the first time in over two and a half months after he complained
to his old block officer, CO1 Kruger, about the yard situation. CO Kruger
happened to be working the RHU that day.

227. Plaintiff had tried numerous times and signed-up for yard constantly
with Spry, Keller, and Shuman when they brought the yard list around during
first shift to no avail.

228. On June 28, 2012 Plaintiff received his response back from the Chief
Hearing Examiner, Lewis, concerning his appeal. It was subsequently denied.
(Exhibit 34)

229. On July 4, 2012 Plaintiff tried to get yard from Sgt. Quinn but was
denied like any other time. Sgt. Quinn stated "you didn't sign-up, your not
on my list, and I am taking out Waldo anyway." Waldo was another inmate from
the Waymart/Scranton area that was maxing out from jail soon. Plaintiff did
ask for yard and witnessed CO1 Palovich, who was a fill-in, write his name
down on the yard list. (Exhibit 48)

230. Plaintiff also has a serious concern involving the procedures of the
grievance system at SCI-Waymart. Inmates are required to place the grievances
into the institutional mailboxes located on the blocks which all area Sgt.'s
have a key for, subjecting them to interception from prison officials. Inmate
grievances are sensitive investigative documents and should have been treated
in a confidential manner. By having the inmates place the grievances into
the institutional mail instead of providing specially designed lockboxes
on the individual blocks where inmates reside most of their time, they subject

the Plaintiff and other inmates to retaliation and other grievous wrongs
from prison officials and a complete deprivation of assistance in resolving
their matters. (Exhibit 39)

231. Plaintiff Believes this can lead to a multitude of harms and possible
retaliations as a result. The dinning halls are the only places with designated
grievance boxes besides the RHU. Inmates were originally informed that the
boxes located in the dinning halls were intended for complaints that dealt
with kitchen issues as they are not allowed to address the food in grievances.

232. When the boxes were originally installed, the Plaintiff overheard the
C-2 dinning Sgt. on second shift state that "he did not know why they put
the boxes there because inmates are not allowed to bring any materials to
the dinning halls and that he would issue a DC-141 misconduct to anyone that
he observed trying to use the new grievance boxes." The dinning halls are
closed most of the day and inmates do not have access to the boxes when they
are locked behind close doors such as they normally are.

232. Plaintiff believes that the disclose of grievance contents to unauthorized
individuals would deprive the him and other grieving inmates of the right
to an impartial adjudication or review of their grievance. He also believes
that the public disclosure of grievance documents would allow inmates and
staff whose alleged misbehavior is described in a grievance, to identify,
harass, threaten or retaliate against the inmate who filed the grievance
in order to coerce the inmate to withdraw the grievance. Moreover, such
individuals would be put on notice to change behavior or destroy evidence
related to the grievance contents, thereby jeopardizing the ability of the
reviewing grievance officer to gather all relevant facts and reach an impartial
or just conclusion with regard to the merits of the complaint.

233. Plaintiff believes inmates and staff that are the object of a grievers
allegations (or those allied with such inmates and staff, by virtue of
friendship, familial relationship, intimate relationship or gang membership)
will retaliate against the grieving inmate. In certain situations, the object
of the griever's allegations may be retaliated against because of the nature
of the allegations.

234. Plaintiff believes that the Court should take note that a prison system
that does not possess a safe and confidential means for inmates to submit
grievances and complaints, such as SCI-Waymart, will be unable to detect
illicit activity and dangerous conditions or behavior. Hazardous conditions
have the potential to persist and grow. Trust between inmates and staff will
erode. The result of which could lead to a more dangerous facility for the
Plaintiff as well as other inmates and staff alike.

235. On July 7, 2012 the Plaintiff, after serving eighty-four days in the
RHU, was released to C-1 early on his good behavior and because of his Unit
Teams recommendation for a time reduction. (Exhibit 40)

236. The Plaintiff believes this was done because they knew they were in
the wrong to begin with and that this theory is further established and shown
by the members of PRC stating "Inmate Cessna should not go back to Unit 3."
This shows that the defendants were aware of the situation and were now trying
to alleviate any further wrongs from occurring in the future. (Exhibit 40)

237. Plaintiff would also out that after he was released he had stopped Deputy
Ellett during count time on M-1 and asked if he could show her his quarters
cards. This was done in an effort to get her to understand just what the
Plaintiff was dealing with. He showed her all of the derogatory names
referring to his sexual preference that had been written on the cards. He
also informed her of the falsified entries. Upon viewing these references
she went crazy telling the Plaintiff that she had had no idea about the extent
of the mistreatments. She called the area Sgt.'s and Lt.'s for all of the
blocks and instructed them to go through every inmates quarters card to see
if anyone else had any derogatory remarks on theirs. She also instructed
the officer on duty, CO1 Cancel, to rewrite the Plaintiff's quarters cards
and have the old quarters cards delivered to her office so that she could
supposedly start an investigation into the discrimination.

238. Cancel, the officer on duty rewrote the Plaintiff's quarters cards as
directed to do so by Deputy Ellett, removing the derogatory names and sent
the old quarters cards to the Unit Manager for M-1, Mark Fryer. Cancel also
wrote on the new quarters cards that the old ones were removed for the

derogatory names and sent to Ellett's office per her direct orders.

239. Ellett then apologized to the Plaintiff and informed his that she did not know about these mistreatments and that she had thought the Plaintiff had only been exaggerating his situation. She informed the Plaintiff that she would find out who placed the derogatory remarks on the cards and get back in touch with him. As of February 10, 2014 she has yet to be in contact with the Plaintiff regarding the derogatory statements on his quarters cards.

240. Cancel and CO1 Gombita can testify to the orders to check the quarters cards of all the inmates as Cancel was present with the Plaintiff and Deputry Ellett, and Gombita received a phone call ordering him to do the inquiry.

241. If the allegations would have been fully investigated and the Plaintiff's concerns addressed properly, as well as allegations made by past inmates, the Plaintiff believes that he would not have been subjected to the abuse and mistreatment he was forced to suffer at the defendants whimsy's.
242. Plaintiff continues to be plagued with minor retaliations and discriminations based on his sexual orientation and because of the complaints he had filed against prison officials. (Exhibit 51)

242. Plaintiff has also had his character defamed by the use of derogatory names spoken out right and by the names placed on his quarters cards showing the full discrimination and further violation of the Plaintiff's Fourteenth Amendment right to Equal Protection by the prison officials at SCI-Waymart.

243. On January 31, 2014 Plaintiff was informed by staff and inmates that during a search of the L and M Housing Units, that Berkoski purposefully and willingly threw and/or destroyed inmates property. Plaintiff was informed by Sgt. Nicholas that what he had done was completely wrong and went against the PA DOC's policies which was also confirmed by CO1 Kilgalon, CO1 Scott, and CO1 Gombita.

244. Plaintiff was also told by various inmates that they are too scared to file grievance's against Berkoski for fear of what he will do.

## VII. EXHAUSTION OF REMEDIES

245. On February 2, 2012 the Plaintiff was found not guilty of misconduct B462330 and it was dismissed with prejudice. As per DC-ADM 801, an inmate may not appeal a verdict of "not guilty."

246. The Plaintiff used the prisoner grievance procedure available at SCI-Waymart to try and solve the problems he was facing. He also made attempts to contact the State Attorney Generals Office, Department of Justice, called the abuse hotline, and finally when all else failed he filed complaints with the clerk of courts in Wayne County. A letter was also sent out to James C. Barnacle, Director of OPR, on March 8, 2012.

247. The first grievance was filed on March 7, 2012 and no response was received. On April 29, 2012 the Plaintiff filed another grievance, 410525, because no answer was forthcoming from the first grievance. Note that the first grievance has no number because it was not returned to the Plaintiff. The grievance Coordinator supplies this number when it is returned to the inmate. Grievance 410525 was answered on May 1, 2012 and it stated that Vinansky had investigated and determined that all the previous grievances submitted by the Plaintiff were processed and answered. The Plaintiff took this as the first grievance being denied automatically and appealed it to Superintendent Gavin on May 1, 2012. In June of 2012 Plaintiff still had not received a response and took this also to be a denial of the grievance and appealed to Robin M. Lewis, the Chief Hearing Examiner whose response was that the Plaintiff needed an answer from Gavin. Since Gavin has not been forthcoming with an answer as of June 25, 2013, Plaintiff is estopped from pursuing further exhaustion of his administrative remedies in this matter.

248. On April 26, 2012 Plaintiff appealed misconduct, A335634, to PRC and was denied on May 2, 2012. The Plaintiff then appealed PRC's decision to Gavin and was again denied on May 14, 2012. The Plaintiff continued with his appeal process by appealing to Robin M. Lewis which was first sent back on May 25, 2012 for being to long. The new appeal was sent out on June 1, 2012 and finally denied on June 26, 2012.

249. Plaintiff was found guilty of misconduct B274040 on March 22, 2012 and

was informed by Lt. Smith not to file an appeal because he was in the process of conducting an investigation in the matter for the PA DOC and the PSP and that everything would be properly taken care of concerning his abuse and mistreatment.

250. At this time it is the Plaintiff's belief that he has done everything in his power to exhaust his administrative remedies with respect to all claims and all defendants.

## VIII. CLAIMS FOR RELIEF
### COUNT I

(against defendants White, Smith, and Dobbs)

1-250. Plaintiff realleges and incorporates by reference Par. 1-250.

251. The refusal of defendants to provide the needed protection to Plaintiff as a result of him having filed complaints against prison officials constituted retaliation for petitioning the government for redress of grievances and therefore violated the First Amendment of the United States Constitution and are liable for deliberate indifference when they knowingly failed to respond to the Plaintiff's requests for help.

252. As a result of the defendants failure, Plaintiff was subjected to 120 days of punitive segregation, that of which 84 days were served and consisted of placement in Level 5 Housing, and a loss of phone, commissary, job, and a hindrance to yard and religious services causing further stress to his medical conditions resulting in serious physical and emotional injuries.

### COUNT II

(against defendants White, Wertman, Shiffer)

1-252. Plaitiff adopts Par. 1-252 of Count I as Par. 1-252 of this Count.

253. The failure of the defendants to accurately provide and depict the facts for misconduct B462330, which was dismissed with prejudice and resulted in an internal investigation be conducted by the security department at SCI-Waymart caused sufficient hardships and sanctions for the Plaintiff and constituted violations of his First Amendment right to Free Speech and

Expression and his Fourteenth Amendment right to Due Process.

254. As a result of the defendants abusive use of authority the Plaintiff spent almost a full month in the RHU depriving him of his phone privileges, commissary, yard, and religious practices which are afforded to all general population inmates. The disciplinary charges that were dismissed were significantly adverse because they subjected the Plaintiff to the risk of significant sanctions. Following the dismissal of the charges Plaintiff was placed onto the D-1 Housing Unit as explained by Berkoski because defendant White felt that the HEX did not do her job correctly the first time as stated by Berkoski and because he was another means to enforce disciplinary actions causing more unjust wrongs to be performed on the Plaintiff without having a hearing violating his Due Process of law.

## COUNT III

(against defendant Berkoski only)
1-254. Plaintiff adopts Par. 1-254 of Count II as Par. 1-254 of this Count.

255. The refusal of defendant to act reasonably and the retaliation against the Plaintiff for misconduct B462330, which was dismissed with prejudice and caused sufficient hardships for the Plaintiff resulting in the violation of his First Amendment rights to Free Speech and Expression as well as retaliation and violation of his Fourteenth Amendment right to Due Process by imposing sanctions without first conducting a formal hearing.

256. As a result, defendant restricted the Plaintiff to his cell and bed and hampered his verbal communication and association with fellow inmates and staff. Defendant would also not allow the Plaintiff to utilize the housing tracking sheets, call-outs and to receive his own mail as well as the phone sheets, in an effort to impede his communications with outside venues and to further punish the Plaintiff.

## COUNT IV

(against defendant Berkoski only)

1-256. Plaintiff adopts Par. 1-256 of Count III as Par. 1-256 of this Count.

257. The retaliation of defendant in an attempt to silence the Plaintiff for filing complaints against him and his fellow staff members with the Wayne County clerk of courts was accomplished by issuing misconduct B274040 therefore violating the Plaintiffs First Amendment rights to Freedom of Speech and his ability to petition the government for redress of grievances, be free from retaliation, and impeded him from exercising his right of access to the court.

258. As a result of this frivolous misconduct by the defendant, Plaintiff suffered fifteen days cell restriction which hampered his yard and library privileges as well as his communication with outside venues and was later followed by 120 days in the RHU, 84 of which were served thereby denying all privileges afforded a general population inmate, in a blatant attempt to try and further silence the abuse and mistreatment that the Plaintiff was being forced to endore.

## COUNT V

(against defendant Berkoski only)

1-258. Plaintiff adopts Par. 1-258 of Count IV as Par. 1-258 of this Count.

259. Defendant's direct order to the Plaintiff to stay in his cell/bed and not move, denying access tot he housing tracking sheets, mail, and phone sheets, and restricting his ability to communicate, constituted a frivilous disciplinary action and a failure to follow prison procedures and policies without first being given notice or a hearing violated the Plaintiff's Fourteenth Amendment right to Due Process of law under the United States constitution. Further, the defendants use of derogatory names aimed verbally and in writing at the Plaintiff constituted defamation of his character and his right to Equal Protection under the law.

## COUNT VI

(against defendants White, Lt. Smith, Capt. Dobbs, Maj. Kosciuk, Banta,

DelRosso, Ellett, Gavin, and Vinanski)

1-259. Plaintiff adopts Par. 1-259 of Count V as Par. 1-259 of this Counts.

260. The defendants have a policy, practice, or custom of
discriminatory and retaliatory practices being allowed by Berkoski as well
as other prison officials choosing to remain willfully blind and intentionally
causing unconstitutional wrongs to be done to the Plaintiff as well as others.

261. Defendants had knowledge of numerous instances of multiple
unconstitutional violations and unbecoming conduct concerning the
discriminations and retaliations the Plaintiff and other inmates were being
subjected too that were serious, long standing, and obvious and refused to
take appropriate steps to correct those on-going wrongs committed by the
the other defendants under their supervision, making them grossly negligent,
willfully blind, reckless and showing a malicious intent towards the safety
of the Plaintiff and others when it is their job to provide care, custody,
and control.

262. As a result, defendants had to know the Plaintiff's safety and health
were at risk which violated his Eighth Amendment right to be free from
deliberate indifference to his safety and health and the intentional disregard
to his Fourteenth Amendment right to Equal Protection under the law and to
also be free from discrimination and defamation of character due to his
quarter card entries.

263. Further, prison officials should not have been sitting around doing
nothing to prevent the violations of the Plaintiffs rights and are therefore
liable for deliberate indifference when they knowingly failed to respond
to the Plaintiffs constant requests for help.


### COUNT VII

(against defendants Plaksa, Lt. Smith, Lt. DeLucy, Banta, Murphy, Maj. Kosciuk,
DelRosso, Ellett, Lewis, Gavin, and Vinanski)

1-263. Plaintiff adopts Par. 1-263 of Count VIII as Par. 1-263 of this Count.

264. The actions of defendant Lt. Smith in refusing to call all of the witness for the deposition requested by the Plaintiff, Plaksa finding him guilty of violations of the PA Crimes Code and other charges without all of the evidence needed, Lt. Smith providing an inadequate, and inaccurate written misconduct, A335634, which was also used to terminate the investigation that was to be performed for the PSP and of defendants Plaksa, Lt. DeLucy, Banta, Murphy, Maj. Kosciuk, DelRosso, Ellett, Lewis, Gavin, and Vinanski in allowing and upholding the disciplinary decision to stand, denied the Plaintiff Due Process of law and because the Plaintiff was disciplined because he exercised constitutionally protected rights in violation his Substantive Due Process the defendants are all liable in violation of his Fourteenth Amendment right and his First Amendment right to free speech and to be free from retaliation in accordance with the United States Constitution.


## COUNT VIII

(against defendants White, Lt. Smith, and Capt. Dobbs)

1-264. Plaintiff adopts Par. 1-264 of Count VII as Par. 1-264 of this Count.

265. The failure of the defendants to act on their knowledge of a substantial risk of serious harm to the Plaintiff caused by Berkoski violated his Eighth Amendment right to be free from deliberate indifference to his health and safety.

266. As a result of the defendants willful blindness, Plaintiff was forced to suffer unconstitutional wrongs such as discrimination based on his sexual preference and criminal record and retaliation placing him in stressful situations which caused a drop in the Plaintiffs CD-4 count and placement on anxiety and stress medications further injuring the Plaintiff physically and emotionally.

## COUNT IX

(against defendants White, Lt. Smith, and Capt. Dobbs)

1-266. Plaintiff adopts Par. 1-266 of Count VIII as Par. 1-266 of this Count.

267. The refusal of the defendants to authorize a block move for the Plaintiff from the D-1 Housing Unit to another less stressful unit, knowing about the Plaintiffs medical condition, resulting in his CD-4 dropping considerably, his HIV medications needing to be changed, and placement on anxiety medications constituted deliberate indifference to the Plaintiffs serious medical needs in violation of the Eighth Amendment and Fourteenth Amendment to the United States Constitution.

## COUNT X

(against defendants Berkoski, Driver, Martin, White, Lt. Smith, Capt. Dobbs, Sgt. Evans, Sgt. Quinn, and Lt. Stender)

1-267. Plaintiff adopts Par. 1-267 of Count IX as Par. 1-267 of this Count.

268. The Pennsylvania Department of Corrections has a Code of Ethics which specifically prohibits discrimination and use of information for personal gain or for the gain of others.

269. Defendants Berkoski and Martin were not following these standards set out by the PA DOC when they obtained and divulged confidential information without authorization and used that information to violate HIPPA and to discriminate against the Plaintiff causing the undue stress and the potential for serious bodily harm that could have resulted not only from other prisoners but the resulting harm of his CD-4 count lowering from 752 to 392 and to be placed on new HIV medications as well as placement on anxiety and stress medications to further control the Plaintiffs degrading mental and health status.

270. Lt. Stender had a responsibility to supervise and keep Martin under control as did Sgt. Evans and Sgt. Quinn, as he was the RHU supervisor and

should have had some knowledge of the actions being performed by Martin and other RHU staff and as such is liable for the actions of his subordinates.

271. The failure of defendants Berkoski, Driver, White, Lt. Smith, and Capt. Dobbs to take the appropriate steps to ensure the Plaintiff received a normal and safe environment which is afforded to all inmates, despite their knowledge of the Plaintiffs medical condition, constituted deliberate indifference to his serious medical needs in violation of the Eighth Amendment to the United States Constitution.

## COUNT XI

(against defendants Shuman, Spry, Keller, Sgt. Evans, Sgt. Quinn, and Lt. Stender)

1-271. Plaintiff adopts Par. 1-271 of Count X as Par. 1-271 of this Count.

272. The actions of the defendants in denying yard without need or provocation, or in failing to intervene to prevent the misuse of authority, were done maliciously and sadistically and in retaliation and retribution for the complaints filed by the Plaintiff on their fellow officers, constituted cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution.

273. The failure of the defendants to take disciplinary and/or other actions to curb the known pattern of abuse and mistreatment of the Plaintiff by defendants Sgt. Evans, Sgt. Quinn, and Lt. Stender constituted deliberate indifference to the Plaintiff's health and safety and contributed to and proximately caused the above described violation of his Eighth Amendment right.

## COUNT XII

(against defendants Plaksa, Lewis, DeLucy, Banta, Murphy, Maj. Kosciuk, DelRosso, Ellett, and Gavin)

1-273. Plaintiff adopts Par. 1-273 of Count XI as Par. 1-273 of this Count.

274. The actions of defendant Plaksa in the unjustified denial of witnesses, conviction of a disciplinary offense with no real supporting evidence, and failure to give a meaningful statement of reasons for the decisions and by the other defendants in not overturning her decision when Plaintiff appealed are all violations of clearly established Due Process principles and therefore violates the Plaintiff's Fourteenth Amendment right.

275. The Plaintiff has no plain, adequate or complete remedy at law to redress the wrongs described herein. Plaintiff has been and will continue to be irreparably injured by the conduct of the defendants unless this Court grants declaratory and injunctive relief which the Plaintiff seeks.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment granting Plaintiff:

276. A declaration that the acts and omissions described herein violated the Plaintiff's rights under the Constitution of the United States.

277. A declaration that defendant Plaksa's actions in conducting the Plaintiff's disciplinary hearing for misconduct A335634 and defendants Banta, DeLucy, Murphy, Gavin, and Lewis's actions in sustaining it violated the Plaintiffs rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

278. A declaration that defendant Plaksa denying the Plaintiff's witnesses violated the Plaintiff's Due Process in violation of the Fourteenth Amendment to the United States Constitution.

279. A declaration that evidence of the temporal proximity and intervening antagonisms between the exercise of the protected conducts and the adverse actions as well as the evidence of inconsistent reasons for the adverse actions would all likewise point toward a finding of retaliator motivation.

280. A permanent injunction ordering SCI-Waymart officials and the PA DOC to place grievance boxes on all Housing Units and to designate that only the Grievance Coordinator have ultimate access to the grievances.

281. A preliminary and permanent injunction ordering all defendants to adhere to the PA DOC policies and Code of Ethics and refrain from any further discriminations, mistreatments, abuses, retaliations, or otherwise violations to the plaintiff's Constitutional rights.

282. An injunction ordering that the disciplinary convictions described in this complaint be expunged from the Plaintiff's institutional record and the restoration of all reights and privileges.

283. Compensatory damages in the amount of $250,000 against each defendant, jointly and severally.

284. Nominal damages in the amount of $10,000 against each defendant, jointly and severally.

285. Punitive damages in the following amounts:
   1. $50,000 each against defendants Berkoski, Martin, White, Lt. Smith, and Capt. Dobbs.
   2. $35,000 each against defendants Banta, Lt. DeLucy, Maj. Kosciuk, Murphy, DelRosso, Lewis, Ellett, and Gavin.
   3. $25,000 each against defendants Plaksa and Vinanski.
   4. $15,000 each against defendants Sgt. Evans, Sgt. Quinn, and Lt. Stender.
   5. $10,000 each against defendants Spry, Keller, and Shuman.
   6. $5,000 each against defendants Wertman and Shiffer.

286. A jury trial on all issues triable by jury.

287. Plaintiff also seeks recovery of his costs in this suit.

288. Grant any other additional relief this Court deems, just, proper, and

equitable as it may appear that Plaintiff is entitled.


Dated: *2-20-2014*                        Respectfully submitted,



                                          *John. W. Cessna.*
                                          John Wayne Cessna JE-3772
                                          Pro Se
                                          SCI-Waymart
                                          P.O. Box 256
                                          Waymart, PA 18472


### VERIFICATION

I have read the foregoing complaint and hereby verify that the matters alleged
therein are true, except as to matters alleged on information and belief,
and, as to those, I believe them to be true. I certify under penalty of perjury
that the foregoing is true and correct.

Executed at SCI-Waymart, Pennsylvania on *February 20, 2014*.



*John W. Cessna.*
John Wayne Cessna
JE-3772

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOHN WAYNE CESSNA,                                    :

   Plaintiff,                                    :

              :

        v.                                    :

              :

Pennsylvania Department of Corrections to include the :

following personell located within the specified     :

Institutions.                                         :

              :  **SUMMONS**

ROBIN M. LEWIS, Chief Hearing Examiner located at    :

SCI-Camp Hill; Located at SCI-Waymart, WAYNE J. GAVIN,:

Superintendent; RONDA ELLETT, DSFM; PAUL M. DELROSSO, :

DSCS; LAURA BANTA, CCPM; EDWARD KOSCIUK, Major;       :

MICHAEL MURPHY, Unit Manager; LORI WHITE, Unit        :  **14-361**

Manager; JOSEPH VINANSKI, Superintendent's Assistant; :  _____

ANNE PLAKSA, Hearing Examiner; DUANE DOBBS, Captain;  :  Civil Action No.

MICHAEL DELUCY, Lt.; RAYMOND STENDER, Lt.; JODY SMITH,:

Lt.; RODNEY QUINN, Sgt.; DAVID EVANS, Sgt.; MARK      :

BERKOSKI, CO1; LUCIANO DRIVER, CO1; TIM SHIFFER, CO1; :

KEVIN WERTMAN, CO1; CHAD SHUMAN, CO1 DAVID SPRY, CO1; :

KARL KELLER, CO1; BRYAN MARTIN, CO1; sued in their    :

individual and official capacities,                  :

    Defendants.                              :

              :

**TO THE ABOVE-NAMED DEFENDANTS:**

   You are hereby summoned and required to serve upon plaintiff, whose address is P.O. Box 256, Waymart, PA 18472 an answer to the complaint which is herewith served upon you, within 20 days after service, or 60 days if the U.S. Government or officer/agent thereof is a defendant. If you fail

to do so, judgment by default will be taken against you for the relief
demanded in the complaint.


Clerk of Court


Date:_____